UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| JOSEPH STARLING, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:23-CV-203-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| DANA LIMITED LLC, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

This matter is before the Court on Defendant's Motion for Summary Judgment, [R. 31]. Plaintiff filed a response in opposition, [R. 32], and Defendant replied, [R. 34]. As such, Defendant's motion is ripe and ready for review. After Defendant's motion was submitted to the Court, the Court ordered Defendant to supplement one of its filings, [R. 36], and Plaintiff filed a Motion to Strike in response, [R. 37]. For the following reasons, Plaintiff's Motion to Strike, [R. 37], will be denied, and Defendant's Motion for Summary Judgment, [R. 31], will be granted.

I.    **BACKGROUND**

Joseph Starling (hereinafter, "Plaintiff") worked as a Gasketmaker Production Team Member for Dana Limited LLC (hereinafter, "Defendant")[1] from November 7, 2022, until his employment was terminated on April 18, 2023. [R. 25, pp. 18:11–19, 29:10–21, 87:4–9 (Starling

---

[1] Although Plaintiff's immediate employer was Dana Sealing Manufacturing, LLC, Defendant here is Dana Limited LLC. *See* [R. 31-1, ¶ 2 (Kelley Decl.)]. Accordingly, Defendant argues in its Motion for Summary Judgment, [R. 31], that Plaintiff's failure to sue the proper party renders summary judgment appropriate. As Defendant explains, "Dana Sealing Manufacturing, LLC is wholly owned by Dana Sealing Products, LLC, which is wholly owned by Dana Automotive Systems Group, LLC, which is wholly owned by Defendant Dana Limited LLC." [R. 31-1, ¶ 2 (Kelley Decl.)]. The Court considers and rejects Defendant's argument below. *See infra* Section III(B).

Depo.)].[2] During his employment with Defendant, Plaintiff was a member of the United Automobile, Aerospace & Agricultural Implement Workers of America, UAW Local 3062 (hereinafter, "the Union"). *See* [R. 25-9, pp. 1–2 (Ex. 9 to Starling Depo.)]. At the commencement of his employment, Plaintiff signed documents indicating his comprehension and assent regarding Defendant's employment policies and practices, including his understanding "that [Defendant] has a very strict attendance policy." [R. 25-3 (Ex. 3 to Starling Depo.)].

Under that policy, employee attendance is measured using a rolling twelve-month occurrence system, whereby employees receive half an occurrence for absences of two hours or less during their shift and receive one occurrence for absences of greater than two hours. *See* [R. 25-4 (Ex. 4 to Starling Depo.)]. Employee discipline escalates in accordance with the number of occurrences received; at three occurrences, employees receive a verbal warning; at four occurrences, a written warning; at five, a final written warning; and at six, employees are subject to termination. *See id.* In addition to the occurrence system, Defendant's attendance policy categorizes any employees who "No Call/No Show" for three consecutive days as having voluntarily resigned, making them subject to termination. *Id.*

Defendant's employees also operate under the collective bargaining agreement (hereinafter, "CBA") negotiated on their behalf by the Union. Under the CBA, employees may avoid accruing an occurrence by using a vacation day as long as they submit a vacation request form to their supervisor at least twenty-four hours prior to the anticipated absence. [R. 25-9, p. 2 (Ex. 9 to Starling Depo.); R. 27-11, pp. 24–25 (Ex. 11 to Henderson Depo.)]. The CBA also provided employees with "emergency vacation days" that could be used to avoid occurrences, with leave under the Family and Medical Leave Act for those employed by Defendant for more than

---

[2] To the extent the page number listed on a filing differs from the page number assigned by the Court's electronic docketing system, the Court refers to the page number assigned by the Court's electronic docketing system.

one year, with "union time" for representatives of the Union, and with "union medical leave," whereby one of Defendant's Human Resources representatives could approve an employee's requested leave based on a documented medical condition that would prevent them from working for three or more days. *See* [R. 27, pp. 21–22 (Henderson Depo.); R. 31-1, ¶ 5 (Kelley Decl.)].

Plaintiff began to accumulate occurrences within days of beginning his employment with Defendant on November 7, 2022. *See* [R. 25-8 (Ex. 8 to Starling Depo)]. First, Plaintiff received half an occurrence on November 11, 2022. *Id.* Plaintiff then received occurrences on December 1, December 5, and December 15 in 2022. *Id.* After the December 15 occurrence, Plaintiff received a verbal warning pursuant to Defendant's occurrences policy. [R. 25-5 (Ex. 5 to Starling Depo.)]. Plaintiff's next occurrence was given on January 12, 2023, after which Plaintiff received a written warning. [R. 25-6 (Ex. 6 to Starling Depo.)]. Plaintiff then received another occurrence—bringing his total to five and one-half occurrences, half an occurrence short of the six-occurrence threshold for termination—on March 9, 2023, for which Plaintiff was given a final written warning on March 14, 2023, which Plaintiff signed in acknowledgement. [R. 25-7 (Ex. 7 to Starling Depo.)]. Plaintiff admits to his awareness at that time that an additional occurrence would result in his termination. [R. 25, p. 29:3–6 (Starling Depo.)].

Then, on April 13, 2023, Plaintiff received another occurrence—placing him at six and one-half occurrences—for lateness due to his provision of care to the son of his long-term partner, who suffered an injury earlier that day requiring a trip to the emergency room. *Id.* at 29:14–21, 37:20–39:22. At the time of the injury, Plaintiff understood that his lateness would result in an occurrence, *id.* at 40:12–18, leading him to contact Blake Henderson, a Human Resources employee with Defendant, to ask whether he was "fired already." *Id.* at 43:1–9. Ms. Henderson informed Plaintiff that his lateness could result in an occurrence, but that he could still report to

work that day. *Id.* at 43:10–44:1. Out of his options to avoid an occurrence and resulting termination, Plaintiff knew at that time that he had no more emergency vacation days, and was unaware of whether he could take union medical leave, leading Plaintiff to ask Ms. Henderson whether he could use a normal vacation day, to which she responded in the negative because Plaintiff failed to provide twenty-four hours' notice. *Id.* at 44:5–46:3. Although Plaintiff reported to work that day, a Thursday, as well as the following Friday and Monday, Plaintiff was nevertheless informed of his termination under Defendant's occurrences policy on Tuesday, April 18, 2023. *Id.* at 29:10–21; [R. 25-8 (Ex. 8 to Starling Depo.); R. 25-9, p. 1 (Ex. 9 to Starling Depo.)].

After Plaintiff was informed of his termination, on April 24th or 25th, 2023, the Union filed a grievance on Plaintiff's behalf seeking an exception that would permit Plaintiff to use a regular vacation day as though it was an emergency vacation day, and thereby avoid the occurrence from April 13, 2023, and retain his employment. [R. 25-9 (Ex. 9 to Starling Depo.); R. 29, pp. 9:12–24 (Rybicky Depo.)]. The grievance was completed on Plaintiff's behalf by Dale Rybicky, who served as a backup steward with the Union during Plaintiff's time with Defendant. [R. 29, p. 6:10–24 (Rybicky Depo.)]. Plaintiff's grievance was denied at the local level, *id.* at 11:8, leading Mr. Rybicky to consult with Eddie Harley, the president of the Local UAW 3062, about appealing Plaintiff's grievance. *Id.* at 11:3–12:16. Although Mr. Rybicky and Mr. Harley verbally agreed that it was "worth a try" to appeal Plaintiff's grievance, Mr. Harley withdrew Plaintiff's grievance a short time after their conversation, on April 27, 2023. *Id.* at 12:9; [R. 25-9, p. 3 (Ex. 9 to Starling Depo.)].

On June 16, 2023, Plaintiff filed suit against Defendant in Boyle County, Kentucky, Circuit Court. [R. 1, ¶ 1 (Notice of Removal); R. 1-1 (Complaint)]. Plaintiff's action claimed two

violations of the Kentucky Civil Rights Act (hereinafter, "KCRA"), asserting that Defendant failed to accommodate Plaintiff's disability based on Plaintiff's diagnosis of Chiari Malformation Type 1, a brain disease (Count I), and that Defendant wrongfully terminated Plaintiff based on Plaintiff's race (Count II). *See generally* [R. 1-1 (Complaint)]. Plaintiff also raised a "wrongful termination and racially disparate treatment" claim under "42 U.S.C. § 1981" (Count III).[3] *See id.* Defendant responded by filing its notice of removal on July 6, 2023, *id.* at 4, bringing the case before this Court. On August 14, 2024, the Court entered an Order, [R. 23], granting the parties' Stipulation of Dismissal with Prejudice as to Count I of Plaintiff's Complaint, [R. 22], thus leaving only Plaintiff's wrongful termination claims (Counts II and III). On November 15, 2024, Defendant moved for summary judgment on each of Plaintiff's remaining claims. [R. 31]. Plaintiff responded in opposition, [R. 32], and Defendant replied [R 34]. The matter is therefore fully briefed and ripe for review.

## II.    LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 477 U.S. at

---

[3] It is not entirely clear whether Plaintiff sues under 42 U.S.C. § 1981(a) or under 42 U.S.C. § 1981a. "§ 1981(a) and § 1981a are two distinct statutes, outlining distinct rights." *Dillworth v. Wormuth*, No. 3:20-CV-629-CHB, 2021 WL 5749097 at *6 (W.D. Ky. Dec. 2, 2021). 42 U.S.C. § 1981(a) is part of the Civil Rights Act of 1866 and creates a cause of action where private entities discriminate on the basis of race in the making and enforcement of contracts. *See Amini v. Oberlin College*, 440 F.3d 350, 357–58 (6th Cir. 2006). By contrast, 42 U.S.C. § 1981a is part of the Civil Rights Act of 1991 and provides for the recovery of compensatory and punitive damages where the plaintiff successfully shows intentional discrimination under Title VII, but the statute does not create a separate cause of action from Title VII. *See Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 852–53 (2001). Regardless, as the Court discusses below, this distinction does not affect the outcome of this Court's disposition. *See infra* Section III(D).

248. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); see also *Anderson*, 477 U.S. at 256. The moving party may satisfy that burden by demonstrating an absence of evidence to support an essential element of the non-moving party's case for which the non-moving party bears the burden of proof. *Celotex Corp.*, 477 U.S. at 323. In ruling on a motion for summary judgment, a court must construe the evidence and draw all reasonable inferences based on the underlying facts in favor of the nonmoving party.

If the moving party presents sufficient evidence to support its claim that no genuine issue of material fact is present in the case, the burden then shifts to the non-moving party to produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, the Court is not obligated to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). Instead, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.* In doing so, the Federal Rules of

Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). The non-moving party's evidence must result in more than mere "metaphysical doubt as to the material facts," and "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position" will not suffice for the non-moving party to meet its burden. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted); *Anderson*, 477 U.S. at 252. Ultimately, there is no genuine issue of material fact and summary judgment is appropriate if the record, taken as a whole and viewed in the light most favorable to the non-moving party, could not lead the trier of fact to find for the non-moving party. *Matsushita Elec.*, 475 U.S. at 587 (citation omitted).

## III.    ANALYSIS

Defendant argues that multiple deficiencies in Plaintiff's case warrant a grant of summary judgment by this Court. First, a footnote in Defendant's Motion for Summary Judgment, [R. 31], claims that summary judgment is appropriate because Plaintiff did not sue Plaintiff's direct employer, Dana Sealing Manufacturing, LLC, and instead improperly sued Dana Limited LLC, the parent company of Dana Sealing Manufacturing, LLC. [R. 31, p.2 n.1]. Plaintiff's Response did not address that argument, *see generally* [R. 32], which Defendant notes in Defendant's Reply, [R. 34, p. 1 n.1]. Second, Defendant's Reply contends that summary judgment is appropriate in Defendant's favor because Plaintiff's evidence of discrimination is "not in a form that would make [it] admissible." [R. 34, p. 3]. More specifically, Defendant argues that the corporate records to

which Plaintiff cites—"attendance summaries for various (narrowed from nearly 1,000) [of Defendant's] employees from April 2020 to April 2023"—are both improper for the Court to consider at summary judgment under Federal Rule of Civil Procedure 56(c) and, further, are unreliable, making summary judgment in Defendant's favor proper. [R. 34, p. 3–4]. Lastly, Defendant makes two arguments addressing the merits of Plaintiff's racial discrimination claim. Defendant asserts first that Plaintiff fails to make out a prima facie case of racial discrimination under the *McDonnell Douglas/Burbine* burden-shifting framework. [R. 32, pp. 6–10]; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as subsequently modified by *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248 (1981); *see also Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019) ("A plaintiff may show discrimination by direct evidence, or a plaintiff lacking direct evidence of discrimination may succeed on a Title VII claim by presenting indirect evidence under the framework first set forth in [*McDonnell Douglas/Burbine*]."). Then, in the alternative, Defendant argues that even if Plaintiff makes out a prima facie case under *McDonnell Douglas/Burbine*, Plaintiff nevertheless fails to meet his burden under the third step of *McDonnell Douglas/Burbine* because Plaintiff cannot discredit Defendant's asserted nondiscriminatory reason for terminating Plaintiff. [R. 32, pp. 10–14]. In other words, Defendant claims that Plaintiff presents no evidence that Plaintiff's termination for violating Defendant's absenteeism policy was mere pretext for invidious racial discrimination. *Id.* The Court considers each of Defendant's arguments in turn.

### A. Plaintiff's Motion to Strike

Before the Court addresses Defendant's arguments in favor of summary judgment, the Court first considers Plaintiff's Motion to Strike, [R. 37]. After Defendant filed its Motion for Summary Judgment, [R. 31], Plaintiff filed his Response, [R. 32], and Defendant filed its Reply,

[R 34], along with the attached Declaration of Blake Henderson, [R. 34-1] (hereinafter, "Henderson Declaration"). Upon reviewing the declaration, the Court realized that a page appeared to be missing. The Court then entered an Order, [R. 36], specifically directing Defendant to supplement the Henderson Declaration, which Defendant filed, [R. 35]. In response, Plaintiff has filed a Motion to Strike, [R. 37], arguing that Defendant failed to demonstrate good cause for its delay in filing the corrected exhibit under Federal Rule of Civil Procedure 16 and further claiming Defendant's corrected filing is "grossly untimely" in violation of Local Rule 7.1(c). [R. 37, p. 2]. Plaintiff requests that the Court disregard Defendant's corrected filing or, in the alternative, provide Plaintiff with time to substantively respond thereto. *Id.* at 3.

Federal Rule of Civil Procedure 16(b)(4) provides that "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "The primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements." *Andretti v. Borla Perf. Indus., Inc.*, 426 F.3d 824, 830 (6th Cir. 2005) (quoting *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002)). Another "important consideration" is whether the party opposing the modification will "suffer prejudice." *Leary v. Daeschner*, 349 F.3d 888, 906 (6th Cir. 2003) (citing *Inge*, 281 F.3d at 625). However, the Court ultimately has "broad discretion under the rules of civil procedure to manage the discovery process and control [its] docket[ ]." *Marie v. Am. Red Cross*, 771 F.3d 344, 366 (6th Cir. 2014).

As an initial matter, Plaintiff has failed to identify what portion of the Court's scheduling order it believes to be relevant to the Rule 16 analysis. Regardless, the Court notes that its scheduling order does state, "Motion practice shall be governed by Local Rule 7.1 except as otherwise provided" in the scheduling order. [R. 9, ¶ 10]. Local Rule 7.1, in turn, requires that a

party may submit a reply brief within fourteen days of service of the opposing party's response. LR 7.1(c). The Court notes that Defendant did timely file its reply within fourteen days of the filing of Plaintiff's response. [R. 32 (Response, filed Dec. 6, 2024)]; [R. 34 (Reply, filed Dec. 20, 2024)]. And Defendant did attach the Henderson Declaration to that reply, albeit an incomplete version. *See* [R. 34-1].

Thus, it does not appear that Defendant has violated Local Rule 7.1. Moreover, the Sixth Circuit has recognized that "[d]istrict courts have broad discretion in interpreting, applying, and determining the requirements of their own local rules." *Pearce v. Chrysler Grp., LLC Pension Plan*, 615 F. App'x 342, 349–50 (6th Cir. 2015). Given the express language of Local Rule 7.1(c) permitting the Court to order filings to proceed outside its articulated timeline, taken together with the Sixth Circuit's statement as to this Court's discretion, the Court finds Plaintiff's argument under Local Rule 7.1(c) unpersuasive.

Even if the Court were to find that Defendant violated Local Rule 7.1, and thereby violated the Court scheduling order, it would find that good cause is present here under Rule 16. Defendant demonstrated diligence in meeting the Court's original filing deadlines, submitting its Reply and its accompanying Henderson Declaration within fourteen days of Plaintiff's Response to Defendant's Motion for Summary Judgment. *See* [R. 32, R. 34, R. 34-1]. Defendant also diligently responded to this Court's order directing Defendant to supplement the Henderson Declaration, responding the same day the Court issued its order. *See* [R. 35, R. 36]. Defendant's supplemented filing was submitted pursuant to this Court's order, rather than on Defendant's own volition. Additionally, regarding the "important consideration" of whether Plaintiff will suffer prejudice because of Defendant's filing, the Court notes that Plaintiff's Motion to Strike does not argue that Plaintiff will suffer prejudice at all, and instead solely argues that Defendant lacks good cause. *See*

[R. 37]. However, even if Plaintiff had argued prejudice, the Court finds that Plaintiff will not suffer prejudice because Plaintiff had full notice of the existence and contents of the Henderson Declaration, [R. 34-1], as shown by the timely filing of Defendant's Reply and the Reply's frequent and detailed citations to the contents of the Henderson Declaration. *See* [R. 34, pp. 8–10]. Defendant's Reply specifically cites to the portions of the Henderson Declaration that were later included in Defendant's supplemented filing—namely, to paragraphs five through twelve of the Henderson Declaration. *See* [R. 34, pp. 8–9]; *cf.* [R. 34-1. R. 35]. Plaintiff cannot argue that he will suffer prejudice when, due to the contents of Defendant's Reply, he was on full notice as to the full contents of the corrected Henderson Declaration. That is, there is nothing new in the corrected Henderson Declaration that was not already in Defendant's Reply. Moreover, Plaintiff could have sought this Court's leave to file a Sur-reply addressing the contents of Defendant's Reply and the original Henderson Declaration, but Plaintiff failed to do so. To grant Plaintiff an extension of time to respond to Defendant's supplemented Henderson Declaration—which restates information already contained in Defendant's Reply, filed more than nine months ago, on December 20, 2024—would effectively extend Plaintiff's time in which to request permission to file a sur-reply long past the deadline for Plaintiff to make such a request. Taken together, the Court therefore finds that Federal Rule of Civil Procedure 16(b)(4)'s standard is met, based on its finding of good cause and the Court's consent, as well as the lack of prejudice to Plaintiff.

After considering the facts and law, the Court will not strike Defendant's supplemented Henderson Delcaration, nor will it grant Plaintiff additional time in which to file a response thereto.[4] Accordingly, the Court will consider Defendant's supplemented filing, [R. 35], in full in its consideration of Defendant's Motion for Summary Judgment below.

---

[4] The Court further notes that, as far as the Court can discern, Plaintiff deposed Defendant's Human Resources employee Blake Henderson and a Union representative, but failed to ask any questions concerning the twenty-plus

### B. Effect of Plaintiff Suing his Employer's Parent Company

As mentioned, Defendant argues that summary judgment is appropriate because Plaintiff sued the parent company of his employer rather than his actual employer. *See* [R. 31, p. 2 n.1; R. 34, p.1 n.1]. The Court first notes that Defendant cites a single authority for its position and devotes a mere footnote to this argument. *See id.* This undeveloped argument thus need not be considered by the Court. *See Members Heritage Credit Union v. New York Marine & Gen. Ins. Co.*, 5:21-CV-207, 2023 WL 4876383, at *13 (E.D. Ky. July 31, 2023) (explaining that the party's argument "is wholly undeveloped, and the Court need not consider it" (citations omitted)); *Brown v. Astrue*, No. 09-387, 2010 WL 4878866, at *3 (E.D. Ky. Nov. 24, 2010) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (citing *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997))).

Regardless, even assuming Plaintiff sued the correct entity, Plaintiff's claims nevertheless fail for the reasons outlined below. *See infra* Section III(D).

### C. Defendant's Evidentiary Argument

Defendant also argues that Plaintiff's proffered comparator data, drawn from "attendance summaries for various (narrowed from nearly 1,000) [of Defendant's] employees from April 2020 to April 2023," is "not in a form that would make [it] admissible" and is insufficient as a matter of law to support Plaintiff's claim of discrimination. [R. 34, pp. 3–4]. Defendant cites Federal Rule of Procedure 56(c)(2), which permits parties to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

---

employees he relies on in his Response, despite asking about his other proposed comparators, Peggy and Tiffany. *See* [R. 27 (Henderson Depo.), R. 29 (Rybicky Depo.), R. 32].

The Sixth Circuit's application of Rule 56, based on the United States Supreme Court's decision in *Celotex Corporation*, provides that the evidence proffered by the party seeking to survive summary judgment "need not be in admissible *form*, but its *content* must be admissible." *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997) (citing *Celotex*, 477 U.S. at 324). In other words, courts may consider at the summary judgment stage evidence that would be inadmissible at trial, as long as the contents of that evidence could be presented in a different, admissible form at trial. *See id.* ("For instance, deposition testimony will assist a plaintiff in surviving a motion for summary judgment, even if the deposition itself is not admissible at trial, provided substituted oral testimony would be admissible and create a genuine issue of material fact.").

Defendant's admissibility argument is unpersuasive. Under the applicable standard, at the summary judgment stage, Plaintiff need not present his evidence in a form that would be admissible at trial, as long as it is *possible* that Plaintiff could produce the evidence in an admissible form at trial. *See Bailey*, 106 F.3d at 135. Defendant offers no reason why Plaintiff would be unable at trial to introduce Defendant's employment records as authenticated business records by calling one of Defendant's employees to the stand, such as Blake Henderson or Clint Kelley, each of whom have already contributed their statements to the record in this case. *See* [R. 27 (Henderson Depo.); R. 31-1 (Kelley Decl.)]. Plaintiff's Response already refers to Henderson and Kelley as "both serv[ing] in a Human Resources role for all employees discussed in [Plaintiff's] Response . . . ." [R. 32, p. 12]. Given the potential for Plaintiff to produce Defendant's corporate records in an admissible form should the case go to trial, this Court may, under the Sixth Circuit's standard, consider those records at the summary judgment stage.

Defendant's other argument—that "Plaintiff's interpretation of [Defendant's] records amounts to improper legal conclusions and unsupported assertions of fact"—addresses the *weight* and *persuasiveness* of Plaintiff's evidence, rather than its *admissibility* under Federal Rule of Civil Procedure 56(c). [R. 34, p. 4]. As explained in the Court's comparator discussion below, the core problem with Plaintiff's evidence is not its admissibility, but rather that Plaintiff has offered no context or details concerning these employees to assist the Court in determining whether they are apt comparators. *See infra* Section III(D)(1)(b).

### D.  Plaintiff's Racial Discrimination Claim Under the KCRA (Count II)

Plaintiff alleges that he was discharged due to his race in violation of the Kentucky Civil Rights Act. [R. 1-1, pp. 5–8 (Complaint)]. The KCRA makes it unlawful for an employer "[t]o fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's race." KRS § 344.040(1)(a). "[T]he KCRA is modeled on Title VII of the Civil Rights Act of 1964," meaning that "federal decisions interpreting the federal act are 'most persuasive, if not controlling, in interpreting the Kentucky statute.'" *Stacy v. Shoney's, Inc.*, 142 F.3d 436, *2 (6th Cir. 1998) (quoting *White v. Rainbo Baking Co.*, 765 S.W.2d 26, 28 (Ky. Ct. App. 1988)). "A plaintiff may show discrimination by direct evidence, or a plaintiff lacking direct evidence of discrimination may succeed on a Title VII claim by presenting indirect evidence under the framework first set forth in [*McDonnell Douglas*]." *Redlin*, 921 F.3d at 606. Here, Plaintiff does not point to any direct evidence of discrimination. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 n.5 (6th Cir. 2008) (explaining that direct evidence of discrimination is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions," and that circumstantial evidence, "on the other hand, is proof

that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred") (citation modified) (cert. denied) (abrogated on other grounds); *Bledsoe v. Tenn. Valley Auth. Bd. of Directors*, 42 F.4th 568, 578 (6th Cir. 2022) ("Direct evidence is evidence that proves the existence of a fact without requiring any inferences. The evidence, on its own, must lead a reasonable juror to conclude that a decisionmaker was biased, and that adverse animus motivated the adverse action.") (citation modified). Moreover, Plaintiff's complaint appears to implicitly acknowledge that he lacks direct evidence of racial discrimination, as Plaintiff cites to *McDonnell Douglas* in his complaint and makes his claims through the lens of its familiar burden-shifting framework. *See* [R. 1-1, pp. 8–11].

Under that framework, a plaintiff alleging racial discrimination must establish as his prima facie case that he (1) was a member of a protected class; (2) was qualified for their job; (3) suffered an adverse employment action; and (4) was either replaced by a person outside the protected class or was treated differently than similarly-situated non-protected employees. *Blount v. Stanley Eng'g Fastening*, 55 F.4th 504, 510 (6th Cir. 2022); *see also Adebisi v. Univ. of Tennessee*, 341 F. App'x 111, 112 (6th Cir. 2009) (citing *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006)). Where a plaintiff successfully makes out a prima facie case in the first step of the *McDonnell Douglas* framework, "[t]he burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions, supported by admissible evidence that if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021). Once the employer articulates such reasons, "the employee has the burden of proving by a preponderance of the evidence that the employer's proffered reasons were a mere pretext for discrimination." *Id.* at 508–09; *see also Wright*, 455 F.3d at 706–07 ("Throughout [the] burden-shifting approach, the plaintiff

continues to bear the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate."). In other words, although "[t]he employer bears the burden of production at the second step, . . . the employee bears the ultimate burden of production and persuasion." *Briggs*, 11 F.4th at 509.

### 1. Plaintiff's Prima Facie Case

Of the four components to Plaintiff's prima facie case, the parties here do not dispute that Plaintiff establishes the first three. *See* [R. 31, pp. 7–8 (Mot. for Summary Judgment)]. Instead, the parties' dispute lies with the fourth element—whether Plaintiff was replaced by a person outside the protected class or was treated differently than similarly-situated, non-protected employees (i.e., than "comparators"). Defendant's Motion for Summary Judgment argues that Plaintiff can show neither. *Id.*

Regarding replacement, "a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990). Instead, "[a] person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Id.*; *see also Mayhue v. Cherry Street Servs., Inc.*, 598 F. App'x 392, 402 (6th Cir. 2015). Here, Plaintiff does not present facts showing that he was replaced by a person of a different race. *See generally* [R. 1-1 (Complaint); R. 32 (Response to Mot. for Summary Judgment)]. By contrast, Defendant's evidence suggests that Plaintiff was not replaced; Clint Kelley, a Human Resources Manager at Plaintiff's employer, states: "[Defendant] regularly hires gasketmakers, hiring for the position and not to replace employees who leave. When Mr. Starling's employment was terminated, his duties were distributed among other gasketmakers." [R. 31-1, ¶ 7 (Kelley Decl.)]. Given Plaintiff's lack of evidence regarding his

replacement and Defendant's undisputed showing that Plaintiff was not, in fact, replaced, the Court finds that Plaintiff cannot meet the fourth element of his prima facie case under the *McDonnell Douglas* framework by showing that he was replaced by a person outside of his race.

For Plaintiff to establish a prima facie case of employment discrimination, then, Plaintiff must show that he was "treated differently than similarly situated non-protected employees." *Redlin*, 921 F.3d at 606–07. But Defendant argues in its Motion for Summary Judgment that Plaintiff "can offer no evidence of being treated differently than non-protected similarly situated employees," making summary judgment appropriate. [R. 31, p. 10].

"To be considered similarly situated, a comparator need not be identical, but should be similarly situated 'in all relevant respects.'" *Blount*, 55 F.4th at 511 (citation omitted). "'Superficial similarities between a disciplined employee and his colleagues' are not enough to make them comparators." *Id.* at 511–12 (quoting *Arendale v. City of Memphis*, 519 F.3d 587, 604 (6th Cir. 2008)). "Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated." *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004) (citing *Pierce v. Commonwealth Life Ins.*, 40 F.3d 796, 802 (6th Cir. 1994)). Employees may also be similarly situated if they "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Adebisi*, 341 F. App'x at 112 (internal citation and quotation marks omitted); *see also Blount*, 55 F.4th at 512.

Plaintiff's Complaint lists two potential comparators, identified as "Tiffany" and "Peggy." [R. 1-1, pp. 4–5, ¶¶ 32–45]. Plaintiff's Response to Defendant's Motion for Summary Judgment for the first time introduces approximately twenty additional comparators, identified by their

Employee ID number only through Defendant's employment records. *See* [R. 32, pp. 6–10; R. 32-7; R. 32-8, R. 32-9; R. 32-10; R. 32-11; R. 32-12; R. 32-13; R. 32-14; R. 32-15; R. 32-16; R. 32-17; R. 32-18; R. 32-19; R. 32-20; R. 32-21; R. 32-22; R. 32-23; R. 32-24; R. 32-25; R. 32-26; R. 32-27; R. 32-28; R. 32-29; R. 32-30; R. 32-31; R. 32-32; R. 32-33; R. 32-34; R. 32-35]. The Court will address Plaintiff's comparators in two sections, with the first section analyzing Tiffany and Peggy as comparators and the second section addressing the numerous other comparators Plaintiff identifies in his Response. *See* [R. 32].

### a. Comparators from Plaintiff's Complaint: Tiffany and Peggy

Plaintiff's Complaint describes two potential comparators to support Plaintiff's claim of racial discrimination in violation of the KCRA. Plaintiff describes the first, "Tiffany," as one of Plaintiff's white coworkers who was "permitted to cover absences with unused vacation days" and "was permitted three (3) more absences [after] she received her 'final occurrence' for absenteeism." [R. 1-1, p. 4, ¶¶ 32–33]. Plaintiff claims that the second, "Peggy,"—also called "P.S." in later filings—was rehired by Defendant "the week after [Defendant] terminated her for attendance issues." *Id.* at p. 5, ¶ 42. Plaintiff also asserts that "Tiffany, Peggy, and [Plaintiff] all had the same supervisor" and "all worked in the position of Gasketmaker," but notes that "Peggy and Tiffany are Caucasian," unlike Plaintiff, who is black. [R. 1-1, pp. 2, 5, ¶¶ 7, 45].

Defendant asserts in its Motion for Summary Judgment that neither Tiffany nor Peggy demonstrates that Plaintiff was treated differently than non-protected, similarly situated employees. *See* [R. 31, pp. 8–10]. Tiffany, Defendant claims, was terminated for accruing three no-call/no-shows, although "[s]he may have also reached six occurrences at the same time . . . ." *Id.* at 8 (citing [R. 27, pp. 64:2–65:5 (Henderson Depo.)]). In rebuttal, Plaintiff's Response does not even address—much less persuasively argue—Defendant's explanation regarding Tiffany, and

indeed does not mention Tiffany at all. *See* [R. 32]. Plaintiff's failure to present any responsive argument regarding Tiffany, taken together with Defendant's assertions and evidence, leads this Court to conclude that Tiffany is not a proper comparator under the applicable standard articulated by the Sixth Circuit. Specifically, because Tiffany was terminated for three consecutive no-call/no-shows while Plaintiff was terminated for accruing six occurrences, Tiffany did not "engage[] in the same conduct" as Plaintiff. *See Adebisi*, 341 F. App'x at 112. Moreover, even if the Court viewed Tiffany's violations as the "same conduct" as Plaintiff's, Tiffany and Plaintiff were treated the same: both were fired for violating Defendant's absences policy. Tiffany is therefore not an appropriate comparator in Plaintiff's case.

Turning to Peggy, Defendant argues she was also treated the same as Plaintiff—that is, she was terminated after reaching six occurrences. [R. 31, p. 9 (Mot. for Summary Judgment)] (citing [R. 27, pp. 51:2–54:8 (Henderson Depo.)]). Defendant further explains in detail the circumstances surrounding Peggy's reinstatement after her termination. According to Defendant, Peggy accrued her fifth occurrence when she left work after a workplace-related spill. [R. 27, p. 51:16–23]. Peggy informed her supervisor that she would leave work and return home for the day. *Id.* According to Defendant's Human Resources representative Blake Henderson, Peggy's absence would have been excused if she had either (a) returned to work after changing her clothes or (b) asked for permission from her supervisor to leave for the day and requested that some of her allocated time off, such as emergency vacation days, cover her absence. *Id.* at 28:4–13, 51:21–23, 52:8–20; [R. 25-4, p. 1 (Ex. 4 to Starling Depo.) (discussing Defendant's notification requirement for employees)]. Because Peggy failed to take either action, and instead stayed at home "for the rest of the shift for several additional hours," Defendant issued her a fifth occurrence. [R. 27, pp. 52:14–20]. Upon learning that she received an occurrence for her absence, Peggy and her representative from the

Union "came to [Defendant's Human Resources department]" seeking the removal of the occurrence. *Id.* at 52:1–6. Over the course of the conversation between Peggy, the Union representative, and various members of Defendant's Human Resources department, Defendant offered to remove the occurrence from Peggy's record. *Id.* at 52:21–53:1. Although Peggy knew from her conversation with Defendant's Human Resources department that the offer was available, the Union ultimately did not accept the offer, unbeknownst to Peggy. *Id.* at 52:21–53:3. Instead, the Union filed a grievance on Peggy's behalf, prompting Defendant to withdraw its offer to remove Peggy's fifth occurrence throughout the course of the grievance process. *Id.* at 53:2–13. The occurrence thus remained on Peggy's record without her knowledge, meaning that when Peggy incurred her next occurrence, she mistakenly believed that it would only be her fifth occurrence, rather than her sixth. *Id.* at 53:10–18. After Peggy was terminated for her sixth occurrence, Defendant learned that Peggy genuinely believed her fifth occurrence had been removed. *Id.* at 53:24–54:6. Given the actions involving the Union, Peggy was reinstated through the Union's grievance process related to her termination. *Id.* at 54:6–8. Accordingly, Defendant argues that because Defendant "terminated [Peggy's] employment when she reached six occurrences," as it did with Plaintiff, Peggy was treated the same as Plaintiff and is therefore an inappropriate comparator. [R. 31, pp. 9–10]. And, in any event, Peggy's circumstances concerning her reinstatement differentiate her from Plaintiff so as to make her an inappropriate comparator. *See* [R. 32, pp. 5–6].

In response, Plaintiff attempts to recharacterize the facts as laid out by Defendant regarding Peggy. *See* [R. 32, pp. 2–4]. First, Plaintiff points to Defendant's attendance policy, accurately describing it as providing no specifically-enumerated "exception . . . for reason of spilling something on oneself in the workplace." *Id.* at 3. The policy provides that employees must give

"proper notification to the supervisor/group leader, production manager, or [Human Resources],"
or will otherwise "be subject to corrective action procedures, up to and including termination."
[R. 25-4, p. 1 (Ex. 4 to Starling Depo.)]. While Defendant's attendance policy specifically states
that "approved scheduled time off is not counted as an occurrence" and is instead defined as one
of the various types of leave available to Defendant's employees, Plaintiff is technically correct
the policy takes a general focus and makes no specific reference to workplace-related accidents.
*See id.* at 1–2. However, Defendant's Human Resources employee Blake Henderson states in her
deposition that Peggy's absence after a workplace-related spill would have been excused had she
requested it before actually leaving work and had she received her supervisor's approval. [R. 27,
pp. 51:21–52:15 (Henderson Depo.)].

Second, Plaintiff notes that Human Resources employee Blake Henderson "admits that
removing this occurrence from [Peggy's] record was a matter of 'good faith.'" *Id.* at 3. From these
points, Plaintiff argues that he logically "should have had an occurrence removed as well, given
that he, unlike [Peggy], did give Defendant notice and his absence was for a medical reason rather
than a simply cosmetic reason . . . ." *Id.* As Plaintiff puts it, "[Plaintiff] asked for an excused
absence and received an occurrence even though [Ms.] Henderson testified that [Peggy's] absence
for going home to change her pants would have been excused had [Peggy] asked beforehand. This
is racially disparate treatment." *Id.* at pp. 3–4. Notably, Plaintiff does not claim that his absence is
specifically excusable under Defendant's vacation policies, emergency vacation policies, FMLA
leave, or union medical leave. *See generally id.*

In counterargument, Defendant notes that Plaintiff's absence "did not qualify as excused
because [Plaintiff] had either already exhausted, was not eligible for, or did not comply with the
necessary conditions of any other type of approved leave." [R. 34, pp. 5–6]. In other words,

Defendant claims that Plaintiff's characterization of the comparison between his absence and that of Peggy—both excused absences had they been sought in advance, with the only differentiating factor being the races of Plaintiff and Peggy—is inaccurate. *See id.* Defendant offers instead that the proper comparison is that between an unexcused absence by Plaintiff and an excused absence by Peggy. *See id.*

The facts demonstrate that Peggy is not an appropriate comparator. First, Peggy was fired upon her sixth occurrence, as was Plaintiff. [R. 27, p. 53:19–23 (Henderson Depo.); R. 25-8 (Ex. 8 to Starling Depo.)]. Further, although Peggy and Defendant had the same job title and the same supervisor, the facts surrounding Peggy's termination and subsequent reinstatement are precisely the sort of "differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it" that render it inappropriate to treat the employees as "similarly situated." *Adebisi*, 341 F. App'x at 112 (internal citation and quotation marks omitted). The Court further notes its authority under Sixth Circuit precedent to make an "independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the" alleged comparator when other factors, such as the employees' job titles and supervisors, are "not relevant." *Wright*, 455 F.3d at 710 (citation omitted). Under this framework, Plaintiff's argument that race is the only relevant difference between Plaintiff and Peggy is overly simplistic and unpersuasive.

Several key differences make Peggy inappropriate as a comparator. First, Peggy's occurrence for failing to return to work after a work-related spill is facially dissimilar to the occurrence Plaintiff received when he missed work to care for his girlfriend's son. Although Defendant's absences policy does not contain a formal exception for workplace-related accidents, the testimony of Defendant's Human Resources employee Blake Henderson revealed that Peggy's

absence after leaving work and failing to return would have been excused under Defendant's policies had she requested it before actually leaving to change and had she received her supervisor's approval. *See* [R. 25-4, pp. 1–2 (Ex. 4 to Starling Depo.); R. 27, pp. 51:21–52:15 (Henderson Depo.)]. By contrast, Plaintiff requested his absence in advance, but it was not excused because Plaintiff had already exhausted his emergency vacation days and did not qualify to use a regular vacation day or a day of medical leave. *See* [R. 25, pp. 43:17–45:3 (Starling Depo.)]. Additionally, Peggy's later-excused absence occurred as a result of a workplace-related spill, whereas Plaintiff's unexcused absence was not work-related, but involved an accident concerning Plaintiff's girlfriend's son. [R. 27, p. 51:16–20 (Henderson Depo.); R. 25, pp. 37:20–38:4 (Starling Depo.)]. Lastly, the employees' respective knowledge at the time they each incurred their sixth occurrence is informative. Regarding Peggy, an investigation by Defendant revealed Peggy's genuine lack of knowledge that the Union rejected Defendant's offer to remove the occurrence she had incurred and further revealed that the Union failed to communicate to Peggy that it had rejected the offer. [R. 27, pp. 53:10–54:8 (Henderson Depo.)]. Peggy therefore incurred her final occurrence, which resulted in her termination, without the knowledge that the occurrence would lead to that result. *See id.* By contrast, Plaintiff admits that he knew his occurrence on April 13, 2023, would be his sixth and result in his termination. [R. 25, p. 29:3–21 (Starling Depo.)].

Considering all the facts, despite Peggy and Plaintiff having the same supervisor and the same job title, there are significant "differentiating or mitigating circumstances" that distinguish Peggy's treatment by Defendant from Plaintiff's treatment by Defendant. *See Adebisi*, 341 F. App'x at 112. Moreover, this court's "independent determination" considering the relevant aspects of Plaintiff's employment status compared to Peggy's employment status finds that the particular facts and circumstances here make Peggy too dissimilar from Plaintiff in light of their

differentiating circumstances to serve as a comparator. *See Wright*, 455 F.3d at 710. Peggy is therefore not similarly situated to Defendant, and is not an appropriate comparator in Plaintiff's case.

### b.  Comparators from Defendant's Employment Records

Plaintiff's Response also identifies twenty-one white employees from Defendant's employment records who, Plaintiff claims, "were either permitted to accrue over six (6) occurrences before being terminated or worse, who were permitted to resign or simply abandoned the job after accruing over six (6) occurrences." [R. 32, pp. 6–10]. Plaintiff also lists two black employees who "faced a more stringent attendance policy than their [white] peers" because they were terminated despite accruing fewer than six occurrences. *Id.* at 10. As evidence, Plaintiff cites to various documents from Defendant's employment records, including a spreadsheet listing employees by their employee numbers, race, title as "Gasketmaker Tier II," and termination status, [R. 32-6], and tardiness records for specific employees containing the number of occurrences they accrued, including the records Peggy and other asserted comparators, [R. 32-7; R. 32-8, R. 32-9; R. 32-10; R. 32-11; R. 32-12; R. 32-13; R. 32-14; R. 32-15; R. 32-16; R. 32-17; R. 32-18; R. 32-19; R. 32-20; R. 32-21; R. 32-22; R. 32-23; R. 32-24; R. 32-25; R. 32-26; R. 32-27; R. 32-28; R. 32-29; R. 32-30; R. 32-31; R. 32-32; R. 32-33; R. 32-34; R. 32-35]. Notably, these records do not list the employee's supervisor or contain any other factual detail about the circumstances of the employee's termination or status. *See id.*

Plaintiff's Response largely recites the employee's anonymized employee number, race, number of accrued occurrences, and termination status, without providing any additional information relevant to determining whether the comparator is similarly situated with Plaintiff. *See* [R. 32. pp. 6–10]. Although Plaintiff does list four employees who shared the same direct

supervisor as Plaintiff, Plaintiff fails to present evidence surrounding the circumstances of those employees'—or any employees'—terminations or lack thereof. *See* [R. 32, p. 12]. Plaintiff's failure to present such evidence has been recognized by other courts as insufficient to support their status as similarly situated to their proposed comparators. *See, e.g., Owen v. GE Aviation*, No. 4:18-CV-89, 2020 WL 207939, at *3 (W.D. Ky. Jan. 14, 2020), *aff'd* No. 20-5177, 2021 WL 3624783 (6th Cir. Aug. 3, 2021) (declining to find the plaintiff's proposed comparators similarly situated where the plaintiff "provide[d] no specific facts or supporting evidence about the circumstances of [the comparators] that would make them similarly situated"); *Joyner v. Bellsouth Telecommunications, Inc.*, No. 3:13-CV-0298, 2015 WL 328206, at *4 (M.D. Tenn. 2015) (finding that the plaintiff who was terminated under the defendant's absences policy failed to show he was similarly situated to a comparator where he offered "no evidence . . . other than that [the comparator] missed 37 hours without being fired"). Despite Plaintiff's lack of evidence surrounding his proposed comparators' circumstances, Plaintiff argues that those four employees, as well as the other seventeen listed, are nevertheless "all proper comparators" because Plaintiff's supervisor "admitted that he does not have discretion with regard to whether an employee's absence will be excused" and that discretion instead lies with Defendant's Human Resources department. *Id.* at 13.

The Court credits Plaintiff's argument that whether employees share an immediate supervisor may be less relevant in cases such as this one, where Defendant's strict attendance policy was largely enforced through Human Resources representatives, rather than through employee supervisors. *See id.* However, even assuming Plaintiff's proffered comparators are similar in this and other general respects, the largely anonymized information Plaintiff points to in Defendant's employment records addressing more than twenty of Defendant's employees fails to

provide any context or details concerning their discipline or termination for the Court to determine whether these employees are similarly situated. *See Owen*, 2020 WL 207939, at *3; *Joyner*, 2015 WL 328206, at *4. Further, as discussed below, these employee are still not apt comparators because differentiating circumstances are present or because they, like Plaintiff, were also fired for violating Defendant's attendance policy.

Along these lines, Defendant's Reply distinguishes among Plaintiff's remaining proposed comparators by noting that only four of them were supervised by Plaintiff's same supervisor, [R. 34, p. 7 n.2], ultimately arguing that "many of [Plaintiff's] purported comparators were treated the same while the others had differing circumstances." *Id.* at 8. In support, Defendant presents the sworn supplemented Declaration of Blake Henderson, Defendant's Human Resources Generalist (hereinafter, "Supplemented Henderson Declaration") [R. 35]. The Supplemented Henderson Declaration details why each of Plaintiff's proffered comparators is not an apt comparator. *See id.* Notably, because Plaintiff did not question the Union's representative or Blake Henderson about these employees during their depositions, *see generally* [R. 27 (Henderson Depo.); R. 29 (Rybicky Depo.)], Plaintiff advances no additional information as to the similarity of his asserted comparators beyond the general material contained in Defendant's employment records.

First, the Supplemented Henderson Declaration explains that employees 872478, 871760, 877035, and 534650 were actually terminated, like Plaintiff, as soon as they reached 6 occurrences. *Id.* at pp. 2, 4 ¶¶ 3, 14. Employees 875584, 871284, 876963, and 866194 were terminated for violating the no-call/no-show policy before they would have been terminated under the occurrence policy. *Id.* at pp. 2–3 ¶¶ 4, 13. Employee 876347 initially had her absences coded as excused, but after she failed to submit proper medical documentation, her absences were re-coded as unexcused

-26-

and she resigned rather than face termination when the attendance records were run. *Id.* at p. 3 ⁋ 5. Employee 520137 resigned before accruing six occurrences. *Id.* at p. 3 ⁋ 6. Employee 526893 never accumulated six occurrences. *Id.* at p. 3 ⁋ 7. The attendance records show a combined number of occurrences, but the employee left employment with Defendant and, upon rehiring, was reset to zero occurrences. *Id.* Employees 533458 and 873266 did not accrue six occurrences in any twelve-month period. *Id.* at p. 3 ⁋ 8. Employees 861644, 871767, and 867091 all had occurrences mistakenly coded as unexcused that were later correctly re-coded as excused. *Id.* at p. 3 ⁋⁋ 9–10. Employees 800121, 527675, 861644, and 528765 were each not timely notified by their supervisors after discovery of their occurrences, a delay which was in violation of the CBA between Defendant and the Union, thereby requiring the removal of those occurrences. *Id.* at pp. 3–4 ⁋⁋ 11–12. And, Employee 533072 was terminated for violating Defendant's policies for reasons other than attendance. *Id.* at p. 4 ⁋ 15.

The Court organizes the Supplemented Henderson Declaration's explanations in the chart below:

| Employee ID | Employee Race | Defendant's Explanation | Record Entry |
|---|---|---|---|
| 872478 | White | Absences still registered after termination due to delayed removal from the employment system | R. 35, p. 2, ⁋ 3 |
| 875584 | White | Terminated under of no-call/no-show policy before termination under occurrences policy could occur | R. 35, p. 2, ⁋ 4 |
| 871284 | White | Terminated under of no-call/no-show policy before termination under occurrences policy could occur | R. 35, p. 2, ⁋ 4 |
| 876347 | White | Absences initially coded as excused because employee temporarily left for approved health condition | R. 35, p. 3, ⁋ 5 |
| 520137 | White | Resigned | R. 35, p. 3, ⁋ 6 |
| 876963 | White | Terminated under of no-call/no-show policy before termination under occurrences policy could occur | R. 35, p. 2, ⁋ 4 |

| 526893 | White | Left Defendant and was later re-hired, causing occurrences to reset to zero | R. 35, p. 3, ¶ 7 |
|---|---|---|---|
| 861644 | White | Some occurrences later re-coded as appropriate leave under FMLA | R. 35, p. 3, ¶¶ 9–11 |
| 871767 | White | Some occurrences later re-coded because leave had been approved, but then was miscoded | R. 35, p. 3, ¶ 10 |
| 800121 | White | Supervisor failed to issue timely required warnings and discipline upon issuance of occurrences, requiring Defendant to remove occurrences | R. 35, p. 3, ¶ 11 |
| 527675 | White | Supervisor failed to issue timely required warnings and discipline upon issuance of occurrences, requiring Defendant to remove occurrences | R. 35, p. 3, ¶ 11 |
| 533458 | White | Did not accrue more than five and one-half occurrences over any twelve-month period | R. 35, p. 3, ¶ 8 |
| 528765 | White | Supervisor failed to issue timely required warnings and discipline upon issuance of occurrences, requiring Defendant to remove occurrences | R. 35, pp. 3–4, ¶ 12 |
| 867091 | White | Some occurrences later re-coded as excused because employee showed they were previously approved | R. 35, p. 3, ¶ 10 |
| 866194 | White | Terminated under of no-call/no-show policy before termination under occurrences policy could occur | R. 35, p. 4, ¶ 13 |
| 873266 | White | Did not accrue more than five and one-half occurrences over any twelve-month period | R. 35, p. 3, ¶ 8 |
| 534650 | White | Terminated after accruing 6.5 occurrences | R. 35, p. 4, ¶ 14 |
| 533702 | White | Terminated for violating policies unrelated to attendance | R. 35, p. 4, ¶ 15 |
| 871760 | African-American | Absences still registered after termination due to delayed removal from the employment system | R. 35, p. 2, ¶ 3 |
| 877035 | African-American | Absences still registered after termination due to delayed removal from the employment system | R. 35, p. 2, ¶ 3 |

The Supplemented Henderson Declaration undermines Plaintiff's claim that Defendant's white employees were treated more leniently under Defendant's absences policy and likewise rebuts Plaintiff's claim that Defendant's African-American employees "faced a more stringent

-28-

attendance policy than did their [white] peers." *See* [R. 32, pp. 6–10]. The Supplemented Henderson Declaration makes clear that many of Defendant's white employees were, like Plaintiff, fired for attendance violations, and specifically notes that the two African-American employees that Plaintiff proposes as comparators were each fired after accruing six occurrences. *See* [R. 35, p. 2 ⁋ 3].

Notably, the Supplemented Henderson Declaration does not explain the circumstances of Employee 870561's termination, despite Plaintiff citing Employee 870561 as a potential comparator. *See* [R. 32, p. 9; R. 35]. However, Defendant's employment records indicate he accrued eight and one-half occurrences before facing involuntary termination shortly thereafter for "Violation of Co[mpany] Policy/Rules," suggesting that his termination may have been due to absenteeism. *See* [R. 32-6, p. 2; R. 32-24; R. 32-25]. And, regardless, Plaintiff's failure to provide additional information about the circumstances surrounding Employee 870561's termination severely undermines Plaintiff's argument that he and Employee 870561 are similarly situated. *See Owen*, 2020 WL 207939, at *3 (plaintiff who provided "no specific facts or supporting evidence" about proposed comparator failed to establish that they were similarly situated); *Joyner*, 2015 WL 328206, at *4 (plaintiff fired for excessive absences who offered "no evidence concerning [the comparator] other than that [the comparator] missed 37 hours without being fired" could not show they were similarly situated). In other words, Plaintiff's "mere scintilla" of evidence is insufficient to support his claim that he and Employee 870561 are similarly situated. *See Mitchell*, 964 F.2d at 584. Taken together, Defendant's unrebutted evidence demonstrates some of Plaintiff's proposed comparators were treated the same and were fired for attendance policy violations after six occurrences or after another violation. As to the rest, Defendant has demonstrated differentiating

circumstances to show that Plaintiff's proffered comparators are not, in fact, similarly situated to
Plaintiff.

Other courts have rejected similar proffered comparators under analogous facts. For
example, in *Owen v. GE Aviation*, the plaintiff was terminated under the defendant's attendance
policy, after which she sued under Title VII, alleging discrimination in her termination decision.
2020 WL 207939, at *1. As here, the parties in *Owen* did not dispute that the plaintiff established
the first three elements of her prima facie case; rather, the dispute centered on whether the plaintiff
"was treated differently than similarly situated individuals." *Id.* at *2. The court there found that
where the plaintiff attempted to identify comparators in her response to the defendant's motion for
summary judgment by "list[ing] the names of white employees that violated the attendance policy
that were not terminated," yet "provid[ing] no specific facts or supporting evidence about the
circumstances of these individuals that would make them similarly situated," the plaintiff failed to
establish her prima facie case. *Id.* at *3. The Sixth Circuit affirmed the district court, agreeing that
"[Plaintiff] offered no evidence showing that she and her proposed comparators were similarly
situated in all relevant respects or that she and her proposed comparators engaged in acts of
comparable seriousness." 2021 WL 3624782 at *3 (quotations omitted). The same is true here,
where Plaintiff points to largely anonymized employment records without providing any details
about the circumstances of the employee's actions or termination.

Another case, *Joyner v. Bellsouth Telecommunications, Inc.*, also addressed a racial and
disability discrimination suit brought by the plaintiff after he was fired for violating the defendant's
attendance policy, which involved four levels of discipline culminating in termination. 2015 WL
328206, at *1, *1 n.3. The court determined that an appropriate comparator to the plaintiff would
have been subject to the same discipline as the plaintiff under the defendant's attendance policy—

including receiving a letter in lieu of suspension and being informed that termination would result unless improvement in attendance occurred. *Id.* at *3. After that discipline, an apt comparator would have accumulated further absences, like the plaintiff, yet would not have terminated, unlike the plaintiff. *Id.* Based on this comparison, the court granted the defendant's motion for summary judgment after the plaintiff "offered no evidence concerning the white employee to which he compare[d] himself . . . other than that [the employee] missed 37 hours [of work] without being fired." *Id.* at *4. Going into greater detail, the court noted its lack of knowledge as to many relevant facts:

> We do not know whether [the comparator] was approved for FMLA leave or short-term disability and, if so, how many days she had already taken; whether [the comparator] was counseled, warned or given a letter in lieu of suspension for attendance problems; or whether [the comparator] had any other reasons, excused or not, to have missed work. Plaintiff has not shown the specific circumstances of any white employee's requests for leave, the bases for their requests, how much leave they had already taken or how much leave they requested.

*Id.* Moreover, the court cited evidence provided by the defendant's Lead Employee Relations Manager, who "stated that she was not aware of any other [employee of the defendant] who amassed 29 partial or full days of summarized absence after a step of discipline who did not receive the next step of progressive discipline as a result." *Id.* at *4 n.7. Due to the lack of information provided by the plaintiff, the *Joyner* court concluded that the plaintiff's proffered comparator was inappropriate, resulting in the dismissal of the plaintiff's claim. *Id.* at *4, *8.

Lastly, in *Noble v. Brinker International, Inc.*, the Sixth Circuit concluded that the plaintiff, who was fired for a no-call/no-show attendance violation, failed to make out a prima facie case of racial discrimination under Title VII because the plaintiff "failed to produce evidence showing that a similarly situated employee outside the protected class was not discharged." 391 F.3d 715, 728 (6th Cir. 2004). The plaintiff there offered two potential comparators. *Id.* at 729–31. The record

showed that the first comparator failed to appear to work on two occasions, once due to his car breaking down on the highway and again after he gave notice that he was quitting to take another job. *Id.* at 729–30. The plaintiff argued that the comparator was similarly situated "because the fact of termination was communicated to [the plaintiff] after he allegedly missed a shift, while the fact of termination was not communicated to [the comparator], a white server, under like conditions." *Id.* at 730. The Sixth Circuit disagreed, noting that the plaintiff "presented no evidence showing that [the comparator] was permitted to return to work after missing his shift(s), that [the comparator] attempted to return to work after missing his shift(s), or that [the comparator] would have been permitted to return after missing his shift(s)." *Id.* As for the second comparator, the plaintiff introduced as evidence a notation in a manager's book that the comparator was no longer employed because he had not appeared to work in over one week. *Id.* Such evidence, the Sixth Circuit found, "utterly failed" to show that the comparator was a similarly situated employee outside of the plaintiff's protected class, since the plaintiff provided "no evidence as to [the comparator's] position, whether [the comparator] was outside the protected class, whether [the comparator] attempted to return to work after his or her missed shift(s), or any other facts that might have shown that [the comparator] was a similarly situated employee." *Id.* at 731.

Taken together, as to the comparators listed in Plaintiff's Response, Plaintiff has failed to provide "specific facts or supporting evidence about the circumstances of these individuals" and events surrounding their termination that would make them apt comparators. *Owen*, 2020 WL 207939, at *3; *see Joyner*, 2015 WL 328206, at *4. Further, the explanations provided by Defendant as well as the caselaw supports this Court's conclusion that Plaintiff fails to present sufficient evidence that his proffered comparators are similarly situated so as to support his KCRA claim. Accordingly, because Plaintiff presents no appropriate comparators between Tiffany,

Peggy, and the approximately twenty employees listed in Plaintiff's Response, Plaintiff cannot make out the fourth element of his prima facie case under *McDonnell Douglas*, and summary judgment in favor of Defendant is warranted on this ground.

### 2. Pretext

Even if Plaintiff succeeds in demonstrating a prima facie case, his claim still fails because Plaintiff cannot establish a genuine issue of material fact as to Defendant's supposed pretext in terminating Plaintiff's employment. As mentioned, the *McDonnell Douglas* framework provides that if a Plaintiff successfully makes out a prima facie case of discrimination, "[t]he burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions, supported by admissible evidence that if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Briggs*, 11 F.4th at 508. If the employer meets that burden, "the employee has the burden of proving by a preponderance of the evidence that the employer's proffered reasons were a mere pretext for discrimination." *Id.* at 508–09. Here, Defendant's proffered legitimate non-discriminatory reason for Plaintiff's termination is Plaintiff's violation of Defendant's occurrences policy, which Plaintiff does not dispute. *See* [R. 31, p. 10 (Mot. for Summary Judgment); R. 25, p. 29:10–21 (Starling Depo.)]. The burden thus shifts to Plaintiff to establish that this reason was pretextual.

A plaintiff can demonstrate pretext in various ways. As the Sixth Circuit has explained:

> Pretext may be established either directly by persuading the trier of fact that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action. However, the plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds

> light on whether the employer's proffered reason for the employment action was
> its actual motivation.

*Baxter Healthcare*, 533 F.3d at 392–93 (citation modified). The Sixth Circuit, in discussing the

arguments made and evidence presented by the plaintiff regarding each method of showing pretext,

has repeatedly reiterated the distinction between these three methods of establishing pretext. *See*

*Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (overruled on other

grounds); *see also Moore v. Coca-Cola Bottling Co. Consol.*, 113 F.4th 608, 623–27 (6th Cir.

2024) (applying *Manzer*). Methods (1) and (3) are both "easily recognizable" and constitute "direct

attacks on the credibility of the employer's proffered motivation for firing [the] plaintiff . . . ."

*Manzer*, 29 F.3d at 1084. Under method (1), the plaintiff introduces "evidence that the proffered

bases for the plaintiff's discharge never happened, *i.e.*, that they are 'factually false.'" *Id.* (citing

*Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1123 (7th Cir. 1994)). Under method (3), the

plaintiff introduces "evidence that other employees, particularly employees not in the protected

class, were not fired even though they engaged in substantially identical conduct to that which the

employer contends motivated its discharge of the plaintiff." *Id.* By contrast, method (2) is "of an

entirely different ilk," whereby "the plaintiff admits the factual basis underlying the employer's

proffered explanation and further admits that such conduct *could* motivate dismissal." *Id.*

(emphasis in original). The plaintiff's attack on the employer's explanation is indirect, and uses

circumstantial evidence to suggest it is "more likely than not that the employers explanation is a

pretext, or coverup." *Id.* In other words, the plaintiff "attempts to . . . show[] circumstances which

tend to prove than an illegal motivation was *more* likely than that offered by the defendant." *Id.*

(emphasis in original). As applied in discrimination cases, the Sixth Circuit looks for evidence of

animus to support a showing of pretext under this method. *See, e.g., Smith v. Leggett Wire Co.*,

220 F.3d 752, 759–60 (6th Cir. 2000) (racial discrimination); *Siefert v. Liberty Township*, No. 23-3692, 2024 WL 4100897, at *2 (6th Cir. Sep. 6, 2024) (disability discrimination).

Here, Plaintiff attempts to show pretext under methods (2) and (3) as outlined above. *See* [R. 32, p. 15 (Response to Mot. for Summary Judgment)]. Referring generally to his asserted comparators and their absences, Plaintiff cites to Defendant's employment records and claims that their accumulation of occurrences above and beyond six occurrences without termination demonstrates that "[Plaintiff's] 6.5 occurrences either 'did not actually motivate' his termination or were 'insufficient to warrant' his termination." *Id.* (quoting *Abdulnour v. Campbell Soup Supply, LLC*, 502 F.3d 496, 502 (6th Cir. 2007)). Plaintiff specifically points to the facts surrounding Peggy's absence compared to Plaintiff's absence, writing that "the Union inexplicably withdrew Mr. Starling's grievance while pursuing that of [Peggy], and in response to her grievance, Defendant agreed to reverse one of her occurrences" despite the lack of injury to Peggy in contrast with the injury to Plaintiff's girlfriend's son. *Id.*

In reply, Defendant reiterates the distinctions between Plaintiff's circumstances and those of his asserted comparators. *See* [R. 34, pp. 7–10]. Defendant also understandably distances itself from the actions of the Union regarding Plaintiff's grievance as compared to Peggy's grievance. *See id.* at 10. Specifically, Defendant notes that "[Plaintiff] sued [Defendant] for race discrimination" and that "this is not a case against his union for any breach of its duty to represent him." *Id.* Because "the [U]nion's reason [] to withdraw [Plaintiff's] grievance . . . is between [Plaintiff] and his union," Defendant claims that its reason "is not evidence of any claim against [Defendant]" that would create an issue of fact to avoid summary judgment. *Id.*

Upon consideration of the evidence presented, the Court determines that Plaintiff cannot show pretext to the extent required to avoid summary judgment under any of the methods discussed

in *Baxter Healthcare* and *Moore*. *See* 533 F.3d at 392–93; 113 F.4th at 623. Plaintiff does not even argue method (1) of showing pretext, since Plaintiff does not assert that Defendant's proffered reason "has no basis in fact." *See* [R. 32, p. 15 (Response to Mot. for Summary Judgment)]; *Moore*, 113 F.4th at 623.

Plaintiff also fails under method (3) because he cannot show that Defendant's proffered reason "was insufficient to warrant the challenged conduct" *See Moore*, 113 F.4th at 623. Importantly, Plaintiff does not contest that he violated Defendant's absences policy. *See* [R. 25, pp. 40:15–46:3 (Starling Depo.)]. In order to show that Defendant's proffered reason "was insufficient to warrant the challenged conduct," then, Plaintiff must introduce evidence that "other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff". *Moore*, 113 F.4th at 623 (quoting *Madden v. Chattanooga City Wide Serv. Dept.*, 549 F.3d 666, 676 (6th Cir. 2008)).

However, as discussed above in this Court's examination of Plaintiff's comparator evidence, Plaintiff here cannot identify similarly situated employees who were nevertheless treated differently under Defendant's attendance policy. *See infra*, Section III(D)(1); *Bledsoe*, 42 F.4th at 586 ("A plaintiff offering comparator evidence to demonstrate pretext must show that the comparator is similar in 'all relevant respects.'" (quoting *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 893 (6th Cir. 2020))). Compared to previous Sixth Circuit cases denying summary judgment in the defendant's favor, Plaintiff presents vastly less evidence—indeed, no evidence at all—to suggest Defendant's stated reasons were insufficient to terminate Plaintiff. For example, in *Madden v. Chattanooga City Wide Serv. Dept.*, the plaintiff introduced sufficient evidence from which a reasonable factfinder could find the defendant's explanation for the plaintiff's termination

pretextual where the plaintiff showed that "white employees were not fired—or disciplined whatsoever—despite engaging in substantially identical conduct," that the conduct for which he was fired "was commonplace" and "no big deal," and that the plaintiff's termination decision "was tainted by the discriminatory animus of [his supervisor] and the discriminatory information he supplied" to upper management, who made the termination decision. 549 F.3d at 676–77. And, in *Lamer v. Metaldyne Co.*, the plaintiff introduced evidence that he was only terminated under the defendant's employment policies for policy violations he committed after indicating he would be truthful in a potential upcoming EEOC investigation, despite committing "many policy violations" prior to the protected conduct. 240 F. App'x 22, 26, 32 (6th Cir. 2007). Plaintiff's evidence is scant indeed by comparison. Plaintiff therefore cannot prove pretext by showing that Defendant's "proffered reason . . . had no basis in fact[] . . . or [ ] was insufficient to warrant the challenged conduct." *Moore*, 113 F.4th at 623.

As for method (2)—demonstrating that Defendant's stated reason "did not actually motivate [Defendant's] challenged conduct—Plaintiff introduces no evidence of "racial statements" by Defendant, or Defendant's "improper motive," or any potentially discriminatory basis for Defendant's actions. *Moore*, 113 F.4th at 623; *Leggett Wire*, 220 F.3d at 759; *Siefert*, 2024 WL 4100897, at *3. Mere "rumors, conclusory allegations[,] and subjective beliefs . . . are wholly insufficient evidence to establish a claim of discrimination as a matter of law." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992). By failing to offer any circumstantial evidence at all of invidious discrimination against him, Plaintiff cannot show that it is "more likely than not that the employers explanation is a pretext, or coverup." *Moore*, 113 F.4th at 623. Plaintiff

therefore cannot prove pretext by showing his violation of the attendance policy "did not actually motivate the defendant's challenged conduct . . . ." *Id.*; *see* [R. 29, p. 21:3–16 (Rybicky Depo.)].

Taken together, then, even if the Court credited Plaintiff's prima facie case, summary judgment in Defendant's favor would still be appropriate because Plaintiff cannot show that Defendant's asserted reason for Plaintiff's termination was pretextual under any of the methods articulated by *Moore*.

### E.  Plaintiff's Racial Discrimination Claim Under 42 U.S.C. § 1981 (Count III)

As previously discussed, *see supra* n.3, it is not clear whether Plaintiff's claim under 42 U.S.C. § 1981 is brought under § 1981(a) or § 1981a. Either way, Plaintiff's claim fails.

Section 1981 and its subsection (a) provides a substantive cause of action analyzed under the same standard as claims brought under Title VII. *See Amini*, 440 F.3d at 358 ("When a clamant seeks to prove intentional discrimination inferentially in a [§ 1981(a)] case, federal courts follow the burden-shifting framework that the Supreme Court has described for analogous civil rights cases described in [*McDonnell Douglas/Burbine*]."). Therefore, if Plaintiff's third count was brought pursuant to § 1981(a), it fails because Plaintiff's claim under the KCRA—analyzed using the same standard as Title VII—also fails. *See Gray v. AutoZoners, LLC*, No. 22-CV-1069, 2022 WL 16942609, at *4–5 (6th Cir. 2022) (concluding that summary judgment was warranted for the defendants as to the plaintiff's § 1981 claim after examining the facts under "the burden-shifting standard of proof for Title VII cases established in [*McDonnell Douglas*].").

As for § 1981a, it is not clear that the subsection applies to Plaintiff's case at all. Plaintiff's claim is brought under the KCRA—which merely uses the same framework as Title VII cases—rather than under Title VII itself. Still, even if § 1981a applies to the KCRA due to the KCRA and Title VII sharing the same analytical framework, the United States Supreme Court has nevertheless

stated that § 1981a does not provide a standalone cause of action, but merely authorizes new remedies for claims already brought under Title VII:

> Congress . . . made clear through the plain language of the statute that the remedies newly authorized under § 1981a were *in addition to* the relief authorized by § 706(g) [of the Civil Rights Act of 1964]. Section 1981a(a)(1) provides that, in intentional discrimination cases brought under Title VII, "the complaining party may recover compensatory and punitive damages as allowed in subjection (b) of [§ 1981a], *in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964*, from the respondent." (Emphasis added.) And § 1981a(b)(2) states that "[c]ompensatory damages awarded under [§ 1981a] shall not include backpay, interest on backpay, *or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964*." (Emphasis added.)

*Pollard*, 532 U.S. at 852–53. Therefore, to the extent that Plaintiff's third count merely seeks additional damages pursuant to his claim under the KCRA, the Court's dismissal of Plaintiff's KCRA allegations also eliminates this request for relief.

## IV.    CONCLUSION

For these reasons, the Court will deny Plaintiff's motion to strike and will grant summary judgment to Defendant as to all claims in this action. Accordingly, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. Plaintiff's Motion to Strike, [**R. 37**], is **DENIED**.

2. Defendant's Motion for Summary Judgment, [**R. 31**], is **GRANTED.**

3. A separate judgment will be entered consistent with this Order.

This the 30th day of September, 2025.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY